UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BRETT C. BRADSHAW,                    )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )          1:10-cv-943-SEB-MJD
                                      )
MICHAEL J. ASTRUE, Commissioner of    )
the Social Security Administration,   )
                                      )
            Defendant.                )

**ENTRY**

Brett Bradshaw ("Bradshaw") seeks judicial review of a final decision by the

Commissioner of the Social Security Administration ("Commissioner") denying his

applications for Adult Disabled Child Benefits ("ADC") and Supplemental Security

Income ("SSI") under the Social Security Act (the "Act").  See 42 U.S.C. §§ 402(d).

To be eligible for SSI, a claimant must prove he is unable to engage in any

substantial gainful activity by reason of a medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§

423(d)(1)(A); 1382c(a)(3)(A).  To establish disability, the plaintiff is required to present

medical evidence of an impairment that results "from anatomical, physiological, or

psychological abnormalities which can be shown by medically acceptable clinical and

laboratory diagnostic techniques.  A physical or mental impairment must be established

by medical evidence consisting of signs, symptoms, and laboratory findings, not only by a claimant's statement of symptoms." 20 C.F.R. §§ 416.908; 404.1508.

The Social Security Administration ("SSA") has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. §§ 404.1520 and 416.924. If disability status can be determined at any step in the sequence, an application will not be reviewed further. Id. At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the claimant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.924(c). Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Administration has pre-determined are disabling. 20 C.F.R. § 404.1525. If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. §§ 404.1545 and 416.945. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC,

he will not be determined to be disabled if he can perform any other work in the relevant economy. The claimant bears the burden of proof at steps one through four, and at step five the burdens shifts to the Commissioner. <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005). The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision is supported by substantial evidence and otherwise is free of legal error. <u>Kendrick v. Shalala</u>, 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison v. NLRB</u>, 305 U.S. 197, 229 (1938)).

On January 9, 2006, Bradshaw filed an application for ADC, alleging disability since June 2, 2005. His claim was denied on March 2, 2006, and on May 4, 2006, he requested reconsideration of the claim. On June 20, 2006, while his ADC claim was pending at the reconsideration level, Bradshaw also filed a claim for SSI benefits. Both claims were denied upon reconsideration on September 1, 2006. On October 26, 2006, Bradshaw requested an administrative hearing. Approximately two years later, on November 3, 2008, a hearing was held before the Administrative Law Judge ("ALJ"), during which Bradshaw, who was represented by counsel, testified. At step one of the sequential evaluation process, the ALJ found that Bradshaw had been unable to engage in substantial gainful activity since his onset date. At step two, the ALJ found that

Bradshaw suffered from the severe impairments of morbid obesity, degenerative disc disease with kyphosis, degenerative joint disease, and obstructive sleep apnea. At step three, the ALJ found that Bradshaw does not have an impairment or combination of impairments that either meet or medically equal any of the conditions in the Listing of Impairments.

The ALJ found that Bradshaw has the RFC to perform the full range of "sedentary" work. At step four, the ALJ found that Bradshaw is unable to perform his past relevant work, which was as a movie theater usher. At step five, the ALJ found that, considering Baxley's RFC, age, education, and work experience, and relying on the Medical-Vocational Guidelines, there were a sufficient number of jobs in the national economy that Bradshaw could perform. Therefore, the ALJ found that Bradshaw was not disabled and not entitled to benefits. Bradshaw asserts several errors with the ALJ's decision.

Bradshaw, who was born in 1983, was 25 years old and had a high school education at the time of the ALJ's decision. R. at 69, 696, 701. He testified that he had last worked as a movie theater usher in 2002 or 2003, well before his June 2005 alleged disability onset date. R. at 697. Bradshaw has never been married and has no children.

## Evidence

**Indiana University Medical Group.** On April 14, 2004, Bradshaw saw David Wilcox, M.D., for complaints of right knee pain, difficulty sleeping, and possible hepatitis. After examining Bradshaw, Dr. Wilcox diagnosed him with knee strain and

possible sleep apnea. R. at 480. At his next visit, on September 13, 2004, Bradshaw again complained of right knee pain as well as a popping in his left knee. At that time, he was diagnosed with hepatitis probably secondary to fatty liver and obesity. R. at 477.

On January 3, 2005, Bradshaw was seen by Zoltan Csuka, M.D., a board-certified internist. Bradshaw told Dr. Csuka that he had experienced three or four episodes of his heart beating "funny" that were associated with dizziness. Dr. Csuka diagnosed Bradshaw with suspected premature ventricular contractions ("PVCs") and recommended a Holter monitor to continuously record the rhythms of the heart. R. at 346. On February 3, 2005, Bradshaw reported that his palpitations had resolved. R. at 345.

Shortly after his onset date, on June 14, 2005, Bradshaw saw Brian Foresman, D.O., a pulmonary disease specialist, at the sleep medicine clinic. At that appointment, Bradshaw's height was measured at 71 inches and he weighed 343 pounds. Bradshaw reported a history of high blood pressure, irregular heartbeat, and reflux. He also reported that his sleep times were variable, that he had difficulty falling and staying asleep, and that he experienced excessive daytime sleepiness and fatigue that interfered with his functioning. Tr. at 278. Bradshaw underwent a sleep study that revealed findings consistent with obstructive sleep apnea and inadequate sleep hygiene. Dr. Foresman recommended that Bradshaw receive treatment with a CPAP machine and that he try to lose weight. R. at 278-79.

Bradshaw returned to Dr. Csuka for a follow-up visit on June 20, 2005. At that appointment, Bradshaw reported pain in both knees and that the pain in his right knee had

been constant throughout the prior two weeks. Upon examination, Dr. Csuka observed swelling and redness of the right knee as well as diffuse tenderness. Dr. Csuka diagnosed Bradshaw with knee pain and recommended an x-ray. R. at 338. A June 21, 2005 x-ray showed mild degenerative change with bilateral mild medial compartment joint space narrowing and a small patellofemoral osteophyte (a projection or outgrowth of bone) on the right knee. R. at 247. Bradshaw returned to Dr. Csuka on July 26, 2005, with complaints of ongoing bilateral knee pain. Dr. Csuka noted that Bradshaw had recently been diagnosed with obstructive sleep apnea and recommended use of the CPAP machine. R. at 336. On September 28, 2005, Dr. Csuka diagnosed Bradshaw with osteoarthritis in both knees, obesity, and sleep apnea. At that time, Dr. Csuka advised Bradshaw to lose weight by adhering to a 1200 calorie per day diet. R. at 335.

On December 8, 2005, Bradshaw again saw Dr. Csuka, complaining of tremor in the hands, loss of focus, lower back pain, knee pain, and inability to lose weight. Dr. Csuka diagnosed Bradshaw with lower back pain, obesity, and anxiety/depression and prescribed Vicodin for pain relief, Flexeril to treat muscle spasms, and Wellbutrin for depression. R. at 341. A December 9, 2005 radiology report of Bradshaw's lumbar spine was normal. R. at 246, 294. At a follow-up appointment on January 19, 2006, Bradshaw reported that, while he had lost some weight, he was experiencing constant back pain as well as knee pain and occasional dizziness. Dr. Csuka diagnosed Bradshaw with obesity, vertigo, and lower back pain, and recommended an MRI. Id. At that time, Dr. Csuka opined that Bradshaw was totally disabled. R. at 670.

Bradshaw returned to Dr. Csuka on March 29, 2006, with complaints of increased back pain. However, he reported that his knees hurt less and that his anxiety was "better." R. at 333. Dr. Csuka diagnosed Bradshaw with chronic low back pain and osteoarthritis of the knees, but his notes do not include examination findings regarding Bradshaw's back and knees. In a letter dated April 10, 2006, Dr. Csuka opined that Bradshaw was unable work due to chronic knee and back pain, had been disabled since April 2005, and needed to remain off of work for at least one additional year. R. at 240.

On April 29, 2006, Bradshaw underwent a chest x-ray, which revealed a mild anterior wedge deformity at T10-11. That same day, Bradshaw also underwent thoracic spine x-rays which showed mild anterior wedging in the lower thoracic spine at T9 through T12 which caused exaggeration of kyphosis with anterior marginal osteophytes, findings consistent with Scheuermann's disease. R. at 315. On May 17, 2006, Bradshaw reported complaints of lightheadedness, inability to focus, and lack of improvement on Vicodin and was prescribed an increased dose of the drug. R. at 330.

On May 22, 2006, Dr. Csuka completed a Multiple Impairment Questionnaire for Bradshaw. In his assessment, Dr. Csuka gave a fair prognosis and diagnosed Bradshaw with osteoarthritis of the knees, low back pain, morbid obesity, and sleep apnea. R. at 269. Clinical and objective findings supporting Dr. Csuka's diagnoses included knee x-rays showing bilateral osteoarthritis and a sleep study. Dr. Csuka also noted that an MRI of the back was pending. Bradshaw reported primary symptoms of pain in the lower back and knees, constant fatigue, and hypersomnia. R. at 269-70. Dr. Csuka rated Bradshaw's

pain as "moderate," assessing Bradshaw's pain as a 5 on a 10-point scale. Dr. Csuka further opined that, in an eight-hour competitive workday, Bradshaw could sit a total of three hours and stand/walk less than one hour total and that, while sitting, Bradshaw would have to get up and move around every ten minutes for approximately ten minutes each time before sitting again. R. at 270-71. Dr. Csuka determined that Bradshaw could occasionally lift and carry up to five pounds, but never more. Bradshaw was also found to have significant limitations performing repetitive reaching, handling, fingering, and lifting due to his low back pain, and significant limitations using the upper extremities for grasping, turning, and twisting objects, performing fine manipulations, and reaching. R. at 272-73. Dr. Csuka also stated that Bradshaw would need to avoid heights and could not engage in pushing, pulling, kneeling, bending or stooping. Dr. Csuka opined that Bradshaw's pain, fatigue, and other symptoms were frequently sufficiently severe to interfere with his attention and concentration and the doctor estimated that Bradshaw would be absent from work more than three times per month, on average. According to Dr. Csuka, the symptoms and limitations described in his assessment were present since June 2005. R. at 275.

On May 24, 2006, Bradshaw had additional x-rays taken of his thoracic spine, which, similar to his April 29, 2006 x-ray, revealed degenerative disc changes and mild anterior vertebral wedging with kyphosis seen at the lower thoracic junction, consistent with Scheuermann's disease. R. at 243. On June 16, 2006, Bradshaw reported that he was trying hard to lose weight by using an elliptical trainer at home and that he was

having difficulties with memory due to attention deficit disorder ("ADD"). He was given a trial of Adderall to address his complaints that he was suffering from ADD. R. at 329. At his next appointment, on July 14, 2006, Bradshaw stated that he had lost five pounds, but that his pain had increased and that he had seen only marginal improvement with regard to his ADD on Adderall. R. at 327. On August 14, 2006, Bradshaw reported continuing problems with his back and knee pain and a recurrence of his racing heartbeat. Dr. Csuka diagnosed him with chronic lower back pain and arrhythmia. R. at 325.

On September 15, 2006, Bradshaw presented to the emergency room with complaints of heart palpitations and nausea. He was diagnosed with tachycardia, which is an abnormally rapid heart rate, and palpitations, and was advised to have an echocardiogram. R. at 249. An October 9, 2006 laboratory report noted that Bradshaw underwent arrhythmia event monitoring that revealed sinus arrhythmia and isolated PVCs. R. at 284. In Dr. Csuka's October 12, 2006 treatment notes, he observed that Bradshaw had "lost a lot of weight" and was down to 304 pounds. Dr. Csuka diagnosed Bradshaw with depression and osteoarthritis and gave him a psychiatric referral. R. at 320. On November 29, 2006, Bradshaw reported to Dr. Csuka that his back pain was worse, despite the fact that he continued to lose weight. Dr. Csuka diagnosed Bradshaw with chronic lower back pain and prescribed a Fentanyl patch. It was noted that Bradshaw could not undergo an MRI because his body habitus made it impossible for him to fit in the MRI machine. R. at 233. On February 3, 2007, Bradshaw was first able to have an MRI of the lumbar spine, which revealed mild anterior angulation of the lower

thoracic vertebral column at the T11 level and a prior anterior wedge fracture and disc dehydration at the T10-11 level.  R. at 678.

Bradshaw reported continued spine pain on March 2, 2007, and he was prescribed OxyContin and Oxycodone.  R. at 227.  In a letter dated March 7, 2007, Dr. Csuka reported that Bradshaw had been under his care since 2004 for chronic pain of the knees and thoracic spine.  Dr. Csuka diagnosed bilateral degenerative arthritis, spinal Scheuermann's disease, ADD, and depression, and noted that Bradshaw took multiple opioids for his pain.  Dr. Csuka opined that, "[d]ue to a combination of all these disorders, [Bradshaw] is totally disabled."  R. at 225.  On May 24, 2007, Bradshaw reported decreased mood and difficulty establishing psychiatric treatment.  Dr. Csuka diagnosed depression and back pain and prescribed Wellbutrin and pain management.  On November 5, 2007, Bradshaw complained of depression and less control of his pain on medications. R. at 221, 223.  However, Dr. Csuka's treatment notes from March and May 2007 fail to document any examination findings regarding Bradshaw's back or knees.

On April 1, 2008, Rachel Link, M.D., completed a Psychiatric/Psychological Impairment Questionnaire for Bradshaw.  Dr. Link reported that she had begun treating Bradshaw in July 2007, but her treatment notes are not in the record.  Dr. Link diagnosed Bradshaw with major depressive disorder, recurrent ADD, and anxiety disorder.  She determined that Bradshaw's Global Assessment of Functioning ("GAF") score was 55 and that his prognosis was "poor."  R. at 163.  Dr. Link's clinical findings included appetite disturbance with weight change; sleep disturbance; mood disturbance; anhedonia

or pervasive loss of interests; psychomotor retardation; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; blunt, flat, or inappropriate affect; decreased energy; and passive chronic suicidal ideation. R. at 164. Bradshaw's primary symptoms were noted to be poor sleep and energy, variable appetite, difficulty initiating and completing projects, and difficulty maintaining focus and attention on activities. R. at 165.

In the questionnaire, Dr. Link also opined that Bradshaw was "markedly limited" (defined as "effectively precluded") in his abilities to carry out detailed instructions; to maintain attention and concentration for extended periods of time; to perform activities within a schedule, maintain regular attendance, and be punctual within ordinary tolerance; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to set realistic goals or make plans independently. R. at 166-68. Dr. Link also found Bradshaw "moderately limited" (defined as "significantly limited but not totally precluded") in his abilities to remember locations and work-like procedures; to carry out simple one or two-step instructions; and to sustain ordinary routine without supervision. R. at 166.

On the questionnaire, Dr. Link also noted that Bradshaw had episodes of deterioration in work or work-like settings that caused him to withdraw from the situation and/or experience an exacerbation of symptoms that resulted in withdrawal from social

interactions and eventually led to Bradshaw shutting himself in his bedroom. R. at 168.

Dr. Link reported that the medications Bradshaw was taking, which included Wellbutrin,

Adderall, Provigil, Cymbalta, and Vistaril, exacerbated his depression because they

caused irregular sleep patterns and his lack of sleep, in turn, led to increased pain

symptoms. R. at 169. Dr. Link opined that Bradshaw was incapable of even low stress

work and that he would be absent from work more than three times per month, on

average. R. at 169-70.

On April 10, 2009, after examining Bradshaw, Shawn Chen, M.D., a treating

source from Indiana University, completed a Multiple Impairment Questionnaire that was

submitted to the Appeals Council, but was not before the ALJ. Bradshaw's primary

symptoms were listed as chronic lower and mid-back pain and fatigue. R. at 686. Dr.

Chen rated Bradshaw's pain and fatigue as "moderately severe," rating his pain as a 7 on

a 10-point scale and his fatigue as an 8. R. at 687. Dr. Chen gave Bradshaw a poor to

fair prognosis on his diagnoses of osteoarthritis of the knees, sleep apnea, morbid obesity,

hypertension, hyperlipidemia, angulation of the lower thoracic vertebral column, lower

back pain, chronic fatigue, depression, and ADD. R. at 685. Dr. Chen based his findings

on a sleep study, x-rays of the knees, and a spine MRI. R. at 685-86.

Dr. Chen opined that in an eight-hour workday, Bradshaw could sit for a total of

three hours and could stand/walk for a total of one hour, but that he would have to get up

and move around every ten to twenty minutes when sitting and then not sit again for

approximately ten minutes. R. at 687-88. Dr. Chen found that Bradshaw had significant

limitations performing repetitive reaching, handling, fingering, and lifting, and that he was significantly limited in the use of the upper extremities for grasping, turning, and twisting objects, performing fine manipulations and reaching. R. at 688-89. Other limitations that affected his ability to work were a need to avoid heights and restrictions preventing pushing, pulling, kneeling, bending, and stooping. Dr. Chen determined that Bradshaw's pain, fatigue, and other symptoms frequently interfered with his attention and concentration and that his depression contributed to his symptoms and functional limitations. R. at 690. According to Dr. Chen, Bradshaw would be absent from work, on average, more than three times per month as a result of his impairments and treatment. R. at 691. Dr. Chen opined that the symptoms and limitations described in the questionnaire began in June 2005. Id.

**SSA Consultative Examiners.** At the behest of the SSA, on July 27, 2006, Mohammed Majid, M.D., an internist, evaluated Bradshaw's condition. At that examination, Bradshaw reported that he had lost about eighty pounds since he began trying to lose weight, but complained of lower back pain and pain in his knees with an ability to stand for only ten minutes and to sit for no more than thirty minutes. He was observed to be using a cane, which he reported using since September 2005 to help him walk with his knee pain, but he was able to walk inside the exam room without the use of the cane. R. at 436-37. After examining Bradshaw, Dr. Majid noted that he walked with a limp, weighed 316 pounds, was unable to forward bend due to back pain, and demonstrated an inability to heel or toe walk. R. at 437. However, although right knee

13

flexion was painful, Bradshaw had full range of motion in his knee as well as in the rest of his joints, he had no spine tenderness, and the dorsolumbar spine was normal.  Id.  Dr. Majid diagnosed Bradshaw with morbid obesity and degenerative arthritis, but did not provide an opinion as to Bradshaw's functional capacity.  R. at 438.

On July 13, 2006, Howard Wooden, Ph.D., saw Bradshaw for a psychological consultation.  Bradshaw told Dr. Wooden that he had been diagnosed with ADD and that he also suffered from long term memory problems, but that the main reason he was not able to work was because of his pain and that his primary difficulties were physical in nature.  R. at 441, 443.  Dr. Wooden's mental status examination revealed evidence of a low grade depression with mild to moderate dysthymia.  Dr. Wooden noted that, while Bradshaw alleges that he suffers from ADD and memory difficulties, he (Wooden) did not observe evidence of either condition at the evaluation.  R. at 441-42.  Dr. Wooden diagnosed Bradshaw with ADD, making it clear in his notes that this determination was based solely on Bradshaw's allegations that he suffered from the condition, as well as mild to moderate dysthymia.  Dr. Wooden assigned Bradshaw a GAF score of 70, but did not provide an opinion on his mental capacity.  R. at 443.

**State Agency Reviewing Physicians.**  On August 22, 2006, after reviewing Bradshaw's medical records, J. Sands, M.D., a state agency reviewing physician, opined that Bradshaw could perform at least sedentary exertion work.  R. at 411-17.  He further opined that, while Bradshaw's allegations regarding the nature of his symptoms were supported by the medical and other evidence on file, the medical evidence did not support

his contentions regarding the severity of those symptoms and the related functional restrictions.

On August 28, 2006, a state agency psychologist reviewed the record and opined that Bradshaw was not significantly limited from a psychological standpoint other than moderately limited abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. R. at 418. Another state agency psychologist reviewed the evidence on May 30, 2008, and determined that Bradshaw did not have a "severe" mental impairment because he had only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and that there were no episodes of decompensation of extended duration. R. at 189.

**Bradshaw's Testimony.** At the hearing before the ALJ, Bradshaw testified that he was unable to work because of back pain, knee pain, and excessive fatigue. He testified that his back pain started in the middle to upper part of his back and radiated down both legs, but that he had not had any treatment for his back and knee pain other than taking medication. R. at 697, 702. Bradshaw stated that he did not know if his fatigue was a result of his depression or if it was a side-effect of his medications. R. at 697. Bradshaw also alleged depression, irritable bowel syndrome since grade school, and ADD. R. at 697-98, 702, 706. He testified that he was treated by Dr. Link for his psychiatric conditions, who prescribed him Abilify, Wellbutrin, Trazodone, and

Hydroxyzine, and that he also saw a social worker for therapy.  R. at 698.

According to Bradshaw, as a result of his physical problems, he could sit for only ten to fifteen minutes at a time before he experienced increased pain in his back that required him to stand, and that he could stand for no more than three to four minutes at a time before his knees started to bother him and he needed to lean on something to relieve both the knee pain and the pressure in his back.  R. at 699-700.  Bradshaw reported that his ability to lift varied from day to day, but he estimated that he could lift "maybe" ten to fifteen pounds.  R. at 700.  He also testified that he experienced increased pain with reaching, that he avoided using stairs, and that he used a cane for ambulation.  R. at 703, 705.  Bradshaw stated that, as a result of his ADD, he had trouble paying attention and remaining focused and that his depression increased his fatigue and caused him to avoid other people.  R. at 706.

Bradshaw testified that he slept up to fourteen or fifteen hours a day, but that his back and knee pain awoke him every half hour or forty-five minutes.  R. at 699.  Bradshaw reported that he spent up to twenty-three hours a day in a recliner in order to relieve pressure on his spine.  R. at 705.  Although he liked to travel, Bradshaw stated that he could no longer deal with driving for long periods of time.  R. at 699.  While his pain medications reportedly helped "significantly" to "take the edge off" of his pain, they did not make the pain go away and they also caused various side-effect, including lightheadedness, excessive fatigue, and memory loss.  R. at 699-701.

**<u>Discussion</u>**

Bradshaw contends that the ALJ made the following legal errors: (1) finding that Plaintiff had no severe mental impairments at Step 2; (2) failing to follow the treating physician rule, to properly consider Plaintiff's obesity, and to properly evaluate Plaintiff's credibility when determining his RFC; and (3) failing to use a vocational expert at Step 5. We address these arguments in turn.

## I.      The ALJ's Finding of No Severe Mental Impairments

Bradshaw argues that, in determining that he did not suffer from severe mental impairments, the ALJ erred by rejecting the opinion of Dr. Link, who is a treating source, and instead relying solely upon the opinion of a single non-examining source in making his determination.

When evaluating a mental impairment at Step 2, the Commissioner must first determine whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1) and § 416.920a(b)(1). If the claimant is found to have such an impairment the Commissioner must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," 20 C.F.R. § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. § 404.1520a(c)(3). According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are found, then the adjudicator "generally" will conclude that the claimant's mental impairment is

not "severe."  20 C.F.R. § 404.1520a(d)(1).  If the mental impairment(s) are found to be

severe, then they will be considered at the remaining steps in the disability process.

In the case at bar, the ALJ concluded that Bradshaw had the medically

determinable mental impairments of organic mental disorders and anxiety disorder.

However, the ALJ determined that neither mental impairment was "severe" because he

concluded that Bradshaw had only mild limitations in activities of daily living, social

functioning, and concentration, persistence, or pace, and further, that there was no

evidence of an episode of decompensation.  Although the ALJ did not cite to a source in

making this determination, we assume that he relied on the report of a non-examining

state agency psychologist who reviewed the record evidence in May 2008 and made

identical findings.  R. at 179.  In reaching his decision at step two, the ALJ made no

mention of the April 2008 report from Bradshaw's treating physician, Dr. Link.

An ALJ must give "controlling weight" to a treating source's opinion if it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §

404.1527(d)(2).  When an ALJ does reject a treating source's opinion, he must give a

sound explanation for that decision.  Id.  The Commissioner argues that the ALJ was not

required to give the opinion of Dr. Link, Bradshaw's treating psychologist, controlling

weight because her report contained no treatment notes or diagnostic test results to

support her observations.  However, the ALJ did not provide any reasoning at all for

discounting Dr. Link's opinion.  Moreover, even if there are sound reasons for refusing to

18

give a treating source's assessment controlling weight, the ALJ is still required to determine what value the opinion *does* merit. <u>Scott v. Astrue</u>, ___ F.3d ___, 2011 WL 3252799, at *5 (7th Cir. Aug. 1, 2011) (citing <u>id.</u>; <u>Larson v. Astrue</u>, 615 F.3d 744, 751 (7th Cir. 2010)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's speciality, the types of tests performed, and the consistency and supportability of the physician's opinion." <u>Moss v. Astrue</u>, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). Here, the ALJ did not even mention Dr. Link's assessment at step two, let alone evaluate her opinion using these factors. Although the ALJ did refer to Dr. Link's findings when assessing Bradshaw's RFC, he offered no explanation as to what weight, if any, he gave to her findings in making his determination, much less provide a justification for such a decision.

Without any analysis or explanation from the ALJ as to why he rejected Dr. Link's opinion, we are left with a record that does not permit us to engage in a meaningful review of the ALJ's decision. <u>See</u> <u>Scott v. Barnhart</u>, 297 F.3d 589, 595 (7th Cir. 2002); <u>Clifford v Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000). Although the ALJ may have a good reason for rejecting Dr. Link's opinion or affording it little weight, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion," which he has failed to do in this instance. <u>See</u> <u>Scott</u>, 297 F.3d at 595; <u>Clifford</u>, 227 F.3d at 872. Thus, on remand, the ALJ must reevaluate Dr. Link's assessment and articulate his reasons for

either accepting or rejecting her opinion, remaining mindful of the factors noted above.

## II. The ALJ's RFC Determination

Bradshaw asserts that the ALJ's RFC assessment is flawed because, in making his determination, the ALJ: (1) failed to give Bradshaw's treating physician's opinion appropriate weight; (2) failed to consider the impact of Bradshaw's obesity on his RFC; and (3) improperly assessed Bradshaw's credibility. We address these arguments in turn.

As to Bradshaw's first argument, we find that the ALJ failed to provide adequate reasons for rejecting the opinion of Dr. Csuka, Bradshaw's treating physician, in making his RFC determination. As discussed above, the ALJ must provide a sound explanation for rejecting a treating source's opinion and, even if he does so, must go on to explicate what weight he believes the opinion does merit. See Moss, 555 F.3d at 561. Here, the ALJ provided nothing more than a boilerplate explanation for his conclusion that Dr. Csuka's opinion should not be afforded controlling weight.[1] In a conclusory fashion, the ALJ states only that the treating source's opinion is not entitled to controlling weight because it is "not compatible with the level of severity indicated in his clinic notes" and "clearly inconsistent with the remainder of evidence in the record." R. at 20. However, the ALJ failed to further explain what observations contained in Dr. Csuka's clinic notes he finds incompatible so that we may assess his reasoning. The ALJ also failed to explain

---

[1] We note that, when addressing this issue, the ALJ refers only to the "treating source" and "his clinic notes" and does not mention Dr. Csuka by name. We are left to assume that Dr. Csuka is the person to whom the ALJ is referring as the only other treating source is Dr. Link, who is a woman.

the inconsistency between Dr. Csuka's reports and the "remainder of evidence in the record," or, in fact, even to specify what other objective evidence in the record it is that he is referencing. Additionally, the ALJ failed to identify what consideration, if any, he gave to the enumerated factors in 20 C.F.R. § 404.1527(d)(2) to determine what weight, if not controlling, to give to the treating physician's opinion. Although it is true that internal inconsistencies and lack of objective support may provide good cause to deny controlling weight or even to reject a treating physician's opinion, in the case at bar the ALJ's articulation of his reasoning for discounting Dr. Csuka's opinion is inadequate and thus necessitates remand.

Bradshaw next contends that the ALJ's RFC assessment was flawed because the ALJ failed to consider the impact of his (Bradshaw's) obesity when determining his RFC. Social Security Ruling 02-1p requires the ALJ to specifically consider obesity when making an RFC determination because obesity can in some cases increase the claimant's limitations. Contrary to Bradshaw's allegation otherwise, the ALJ in the case at bar did make specific mention of Bradshaw's obesity when assessing his RFC, concluding that Bradshaw's weight had "some impact on his musculoskeletal complaints, but not to the extent that, because of his obesity, they are severe enough to constitute disabling conditions." R. at 20. The ALJ went on to note that Bradshaw did not attribute any respiratory problems or limitations in daily functioning to his obesity and also referenced the fact that Bradshaw had recently lost a significant amount of weight. Accordingly, it is clear that the ALJ did in fact consider Bradshaw's obesity in his RFC assessment, and,

upon our review of his analysis, we find that the ALJ provided sufficient reasons for determining that Bradshaw's obesity did not affect his RFC. Thus, we do not find error on this basis.

Bradshaw also argues that the ALJ improperly assessed his credibility when making the RFC determination. Because we have found other errors in the ALJ's opinion that necessitate remand, we need not determine whether there are flaws in the ALJ's credibility assessment sufficient so as to separately require remand. However, we note our concern regarding one aspect of the ALJ's credibility finding so that the ALJ may be mindful of it on remand. In making his determination regarding Bradshaw's credibility, the ALJ focused in part on Bradshaw's ability to perform certain daily tasks, including putting dishes in the dishwasher, occasionally doing laundry, and caring for his dogs, finding that the ability to engage in these tasks was "hardly compatible with one having severe, intractable back and knee pain." R. at 21. These daily activities are fairly limited, however, and are not the type that generally contradict a claim of disabling impairments. See, e.g., Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001). Nor is it clear how often Bradshaw was able to engage in these activities or if he had any difficulty in doing so. Accordingly, upon remand the ALJ should more clearly articulate his basis for the credibility finding by explaining how performance of these activities of daily living are inconsistent with Bradshaw's complaints of disabling limitations.

## III. Failure to Use a Vocational Expert

Finally, Bradshaw argues that the ALJ erred at step five by failing to consult a

vocational expert to determine what work, if any, Bradshaw is capable of performing. If a claimant has only exertional limitations (those that affect a claimant's ability to meet the strength demands of jobs), a vocational expert need not be consulted and the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. However, if a claimant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then a vocational expert often must testify regarding the numbers of jobs existing in the economy for a person with the claimant's particular vocational and medical characteristics. Lee v. Sullivan, 988 F.2d 789, 793 (7th Cir. 1993). In such cases, the grids may still be used as an advisory guideline. 20 C.F.R. § 404.1569.

Whether the ALJ is required to consult a vocational expert in making his disability determination in the case at bar is dependent upon the weight given to the opinions of Bradshaw's treating sources, to wit, Dr. Link and Dr. Csuka, both of whom identified non-exertional limitations that could affect Bradshaw's ability to perform certain jobs. Because, for the reasons detailed above, we have found that the ALJ must reevaluate the treating sources' opinions on remand to allow for proper review, we are unable to determine at this time whether the ALJ erred at step five. If upon remand, the ALJ credits the assessments of Dr. Link and Dr. Csuka and finds non-exertional limitations, a vocational expert will most likely need to be consulted. However, if, after properly articulating his reasons for doing so, the ALJ rejects the treating sources' opinions, he

may rely solely on the grids in making his disability determination.

**IV.**     **Conclusion**

For the foregoing reasons, the denial is <u>REVERSED</u> and the case is <u>REMANDED</u>

to the agency for reevaluation consistent with this opinion.

IT IS SO ORDERED.


Date: _____08/26/2011_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Jeannine  LaPlace
LAW OFFICES OF HARRY J. BINDER & CHARLES E. BINDER, P.C.
fedcourt@binderandbinder.com

Eddy Pierre Pierre
LAW OFFICES OF HARRY J. BINDER AND CHARLES E. BINKER, P.C.
fedcourt@binderandbinder.com